No. 23-1871

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES,

Appellee

v.

JOSE CARTAGENA, t/n Jose Ruben Cartagena-Rodriguez,

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

BRIEF FOR THE UNITED STATES AS APPELLEE

W. STEPHEN MULDROW
  United States Attorney

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Deputy Assistant Attorney General

JASON LEE
BRANT S. LEVINE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-4373

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION .........................................................2

STATEMENT OF THE ISSUES ..............................................................2

STATEMENT OF THE CASE ..................................................................4

    A.    Cartagena and his fellow police officers chase, shoot, and attack the victim. ...........................................................4

    B.    Cartagena submits a false police report and lies to the prosecutor about the victim's injuries. ...................................6

    C.    Cartagena offers to cooperate with the FBI but does not provide the full story of what happened. .................9

    D.    Cartagena is indicted, tried, and convicted. .........................10

SUMMARY OF THE ARGUMENT .........................................................13

ARGUMENT

    I.    Cartagena waived his sufficiency challenges by failing to brief whether his convictions resulted in a clear or gross injustice. ..................................................14

    II.    No clear or gross injustice would result by affirming Cartagena's convictions. .......................................................16

        A.    Abundant evidence supports Cartagena's conviction for willfully using excessive force ...............17

1.     The jury had more than enough evidence to conclude that Cartagena assaulted the victim. ..................................................................18

2.     The jury had more than enough evidence to conclude that Cartagena acted willfully. ........20

B.     Abundant evidence supports the jury's conclusion that Cartagena submitted a false police report. .........22

C.     Abundant evidence supports Cartagena's conviction for lying to the prosecutor. ...........................................25

III.     The expert's testimony about the victim's statements did not violate the Confrontation Clause. ...........................27

A.     The expert's testimony about the victim's statements was not offered for the truth of the matter asserted. ....................................................28

B.     Many other witnesses testified about the source of C.C.'s injuries, making any error in the expert's testimony harmless. .....................................................34

CONCLUSION ........................................................................37

CERTIFICATE OF COMPLIANCE.........................................38

# TABLE OF AUTHORITIES

**CASES:**                                                              **PAGE**

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ........................................34

*Screws v. United States*, 325 U.S. 91 (1945) ..........................................20

*Smith v. Arizona*, 602 U.S. 779 (2024) ..........................................27-28, 31

*United States v. Andino-Rodríguez*, 79 F.4th 7 (1st Cir. 2023) .............27

*United States v. Boyrie-Laboy*, 99 F.4th 39 (1st Cir. 2024) ...................16

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022) .............................17

*United States v. Cruz-Diaz*, 550 F.3d 169 (1st Cir. 2008) ......................30

*United States v. Daniells*, 79 F.4th 57 (1st Cir. 2023)............................22

*United States v. Garcia-Carrasquillo,*
    483 F.3d 124 (1st Cir. 2007)..........................................................27

*United States v. Godfrey*, 787 F.3d 72 (1st Cir. 2015) ............................34

*United States v. Gonzalez*, 981 F.3d 11 (1st Cir. 2020) .........................26

*United States v. Hernández-Román*, 981 F.3d 138 (1st Cir. 2020) ...15-16

*United States v. Johnstone*, 107 F.3d 200 (3d Cir. 1997) .......................21

*United States v. Maldonado-Peña*, 4 F.4th 1 (1st Cir. 2021) .................27

*United States v. Pagan-Ferrer*, 736 F.3d 573 (1st Cir. 2013) ............18-20

*United States v. Phillipos*, 849 F.3d 464 (1st Cir. 2017) .........................21

*United States v. Ramos-Gonzalez*, 664 F.3d 1 (1st Cir. 2011)................30

**CASES (continued):**                                             **PAGE**

*United States v. Sandoval*, 6 F.4th 63 (1st Cir. 2021) ............................ 32

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) ............................. 23

*United States v. Van Horn*, 277 F.3d 48 (1st Cir. 2002) ......................... 15

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ............................. 26

**STATUTES:**

18 U.S.C. 242 .................................................................................. *passim*

18 U.S.C. 1512(b)(3) .................................................................. 3, 11, 25

18 U.S.C. 1519 ............................................................................... 3, 11

18 U.S.C. 3231 ..................................................................................... 2

28 U.S.C. 1291 ..................................................................................... 2

**RULE:**

Fed. R. Crim. P. 29 ........................................................................ 12, 15

# INTRODUCTION

In November 2014, a group of rogue police officers in Puerto Rico victimized a 17-year-old kid they encountered on the street. The officers chased, shot, detained, pistol-whipped, hit, and slapped the youth. And then the officers covered up their misconduct.

This appeal concerns one of those police officers, Jose Cartagena. A jury convicted Cartagena on two counts related to using excessive force and two counts related to concealing his crimes. Although Cartagena offers various reasons why this Court should vacate his convictions, he cannot overcome the overwhelming evidence against him. That evidence proved beyond a reasonable doubt that Cartagena pistol-whipped and hit a restrained and compliant teenager. And Cartagena himself admitted at trial that he lied about the victim's injuries in his police report and in his statements to a prosecutor.

Although Cartagena continues to argue that his actions were justified, the jury concluded otherwise. Nothing supports disturbing the guilty verdicts, especially under the demanding standard of review that Cartagena must overcome. Thus, this Court should affirm his convictions.

# STATEMENT OF JURISDICTION*

This appeal is from a district court's final judgment in a criminal case.  *See United States v. Jose Cartagena*, No. 3:16-cr-00536-PAD (D.P.R.).  The district court had jurisdiction under 18 U.S.C. 3231.  The court entered final judgment against defendant-appellant Cartagena on October 6, 2023.  (App. 212-219).  Cartagena filed a timely notice of appeal that same day.  (App. 220-221).  This Court has jurisdiction under 28 U.S.C. 1291.

# STATEMENT OF THE ISSUES

1.    Whether Cartagena waived his sufficiency-of-the-evidence challenge by failing to brief whether his convictions would result in a clear or gross injustice.

    a.    If not waived, whether sufficient evidence existed for the jury to convict Cartagena of deprivation of rights under color of law, in violation of 18 U.S.C. 242, when multiple witnesses testified that

---

*    For record citations, "App." refers to Cartagena's Appendix, and "Br." refers to Cartagena's opening brief, each followed by the pertinent page numbers.  "Doc." refers to the district court docket, followed by the pertinent docket number and page number.

Cartagena, while working as a police officer, pistol-whipped and punched a restrained teenager who was not resisting.

b.     If not waived, whether sufficient evidence existed for the jury to convict Cartagena of falsification of records, in violation of 18 U.S.C. 1519, when Cartagena admitted that he filed a police report that omitted the force used on the teenager and misrepresented the cause of the teenager's injuries.

c.     If not waived, whether sufficient evidence existed for the jury to convict Cartagena of tampering with a witness, in violation of 18 U.S.C. 1512(b)(3), when Cartagena admitted that he lied to a prosecutor about the victim's injuries.

2.     Whether, consistent with the Confrontation Clause, the government's expert witness could explain that one basis for her independent conclusions about the victim's injuries was a statement from the victim, who was unavailable to testify at trial; and if not, whether any error was harmless.

# STATEMENT OF THE CASE

## A.      Cartagena and his fellow police officers chase, shoot, and attack the victim.

Defendant Cartagena worked as a police officer for the Puerto Rico Police Department.  (Doc. 517, at 4).  In November 2014, while on patrol in a marked police cruiser, Cartagena and his fellow officers drove by two young men who were talking to each other and possibly dealing drugs. (Doc. 518, at 6-8; Doc. 523, at 7).  Once the young men saw the police officers, they fled, and the officers gave chase.  (Doc. 518, at 9-10).

Officer Carlos Nieves had his gun out while running after one of the young men, who was riding a bike.  (Doc. 517, at 12-13).  Officer Nieves then fired his weapon—accidently, he would later claim—with the bullet striking the teen's back.  (Doc. 534, at 30; Doc. 535, at 9; App. 132, 185). After being shot, the teen screamed and looked back at the officers chasing him.  (Doc. 517, at 59).  No justification existed for Officer Nieves to have shot the young man.  (Doc. 518, at 25; Doc. 523, at 29).

The injured young man, whose initials are C.C., was a scrawny 17-year-old who weighed 130 pounds.  (Doc. 517, at 68; Doc. 523, at 9-10). After being shot, he was grabbed off his bike and taken to the ground by

Cartagena, who was nearly six-feet tall, weighed 255 pounds, and could bench press 520 pounds.  (Doc. 517, at 44; Doc. 523, at 12).

While C.C. was on the ground, Cartagena used his gun to strike the back of C.C.'s head.  (Doc. 518, at 13-14; Doc. 523, at 12; Doc. 524, at 21-22).  That strike left a long, deep, and bloody wound.  (App. 176).  C.C. was not resisting when Cartagena pistol-whipped him; the teen was just lying on the ground, according to another officer who witnessed it.  (Doc. 518, at 14-15).  This eyewitness officer saw no justification for Cartagena to use such force.  (Doc. 518, at 16).

C.C. was handcuffed and placed in the patrol car, wearing a blood-stained shirt that had a hole in the back where he had been shot.  (Doc. 518, at 16-17).  C.C.'s head was also visibly injured on the spot where Cartagena pistol-whipped him.  (Doc. 518, at 17).  In the patrol car, Cartagena sat in the front passenger seat while C.C. was seated in the back between two other police officers.  (Doc. 518, at 19; Doc. 523, at 13).

During the drive to the precinct, the officers in the back seat hit and slapped C.C., causing C.C. to lean forward.  (Doc. 523, at 13).  Cartagena then aggressively pushed him back hard—twice.  (Doc. 523, at 26-27; Doc. 534, at 31).  One time, Cartagena punched C.C. with a closed-hand palm

strike, with his knuckles hitting C.C.'s forehead; the other time, Cartagena used an open-palm strike against C.C's head. (Doc. 523, at 26-27). Cartagena hit C.C. so hard that Cartagena's hand hurt for days afterwards. (Doc. 523, at 27). No justification existed for Cartagena to strike C.C. in the car, according to one of the officers who witnessed it. (Doc. 518, at 20, 25).

## B. Cartagena submits a false police report and lies to the prosecutor about the victim's injuries.

When the officers arrived at the precinct with C.C., Officer Nieves instructed Cartagena to write the police report because Cartagena had hit the teen. (Doc. 518, at 22). Cartagena, though, resisted, telling Nieves, "No, you're going to take the case because you shot him." (Doc. 518, at 22). Officer Nieves then told Cartagena that he would take C.C. to a doctor and report that C.C. was injured by falling off his bike. (Doc. 535, at 11).

While Nieves and Cartagena were discussing how to handle the incident, the two other arresting officers took C.C. into a room and beat him. (Doc. 535, at 6). When a different officer entered the room, he saw C.C. with teary eyes and a red face. (App. 126). Upon leaving, that other officer soon heard two hard blows, like slapping or hitting. (App. 127).

Cartagena then prepared a use-of-force report for C.C.'s arrest. (Doc. 534, at 8; Gov't Ex. 12-1). According to police department policies, any force used by officers must be documented in this report. (Doc. 534, at 23-24). Officers receive repeated trainings on these policies and are warned that lying on use-of-force reports can lead to criminal prosecution. (Doc. 534, at 25-27). Cartagena knew about these policies and the potential consequences for failing to follow them. (Doc. 517, at 41-42).

In the use-of-force report for C.C.'s arrest, Cartagena wrote that C.C. "did not resist [arrest]" but "lost control of the bicycle and fell to the ground." (Doc. 534, at 13; Gov't Ex. 12-1). Cartagena also reported that C.C. "had gotten several lacerations from the fall in the right area of the back, knee and head." (Doc. 534, at 13; Gov't Ex. 12-1). Finally, Cartagena checked a box on the form to indicate that the arresting officers used only verbal warnings and not physical force. (Doc. 534, at 10; Gov't Ex. 12-1). Cartagena did not document that he used his gun to hit C.C.; he did not report that he punched C.C. in the patrol car; and he did not disclose that Officer Nieves was present or that Nieves shot C.C. (Doc. 534, at 10-11; Gov't Ex. 12-1).

A few days after C.C.'s arrest, Cartagena met with a prosecutor from the Puerto Rico Department of Justice to discuss the charges filed against C.C. (Doc. 535, at 24-26). Cartagena told the prosecutor that during the chase, C.C. fell off his bike and was injured from that fall. (Doc. 535, at 29). Cartagena also warned the prosecutor that C.C. might allege that he was assaulted by the officers, but Cartagena assured the prosecutor that those allegations were false and that C.C.'s injuries resulted solely from falling off the bike. (Doc. 535, at 30).

During this and a later meeting with the prosecutor, Cartagena did not mention that he used his gun to hit C.C. in the back of the head, and Cartagena likewise did not disclose that he hit C.C. in the face with his hands during the ride to the precinct. (Doc. 535, at 33-34). Cartagena also never told the prosecutor that Officer Nieves was involved in C.C.'s arrest or that Nieves shot C.C. (Doc. 535, at 33).

The prosecutor relied completely on Cartagena's account when determining what charges to file against C.C. (Doc. 535, at 27). Had the prosecutor known what actually happened, she would have referred the matter to a state agency that investigates police misconduct, which

sometimes results in federal criminal charges being filed against officers. (Doc. 535, at 34-35).

Cartagena later told two other officers that Officer Nieves had shot C.C. (App. 131; Doc. 534, at 30). Cartagena also admitted to one of these officers that he hit C.C. in the head during the ride to the precinct. (Doc. 534, at 31). Cartagena expressed concern that his failure to report the shooting might impact his future police work. (App. 133).

## C. Cartagena offers to cooperate with the FBI but does not provide the full story of what happened.

Nearly a year after the incident, Cartagena contacted the FBI, offering to provide information about misconduct by his fellow police officers. (Doc. 523, at 5). During his first in-person meeting with the FBI, Cartagena told the agents about C.C.'s arrest, but Cartagena did not disclose that he pistol-whipped or hit C.C., nor did Cartagena tell the FBI that Officer Nieves shot C.C. (Doc. 523, at 7-9). The FBI then interviewed C.C., who provided a conflicting account of what happened. (Doc. 523, at 9).

The FBI then spoke to Cartagena three more times over the next two months. (Doc. 523, at 10-20). After the second interview, the FBI informed Cartagena that he was the target of a federal civil rights

investigation, that anything he said could be used against him, and that his cooperation could affect any potential sentence. (Doc. 523, at 16, 19).

In his final interview with the FBI, Cartagena gave a much longer and more detailed statement. (Doc. 523, at 19). First, he told them that Officer Nieves shot C.C. (Doc. 523, at 21). Second, Cartagena stated that when C.C. was on the ground and tried to stand up, Cartagena used the butt of his gun to forcefully hit C.C. on the back of the head. (Doc. 523, at 22-24). Cartagena admitted to being angry when he struck C.C. (Doc. 523, at 24). Finally, Cartagena acknowledged that in the patrol car, he used hard and aggressive closed-hand and open-hand palm strikes to push C.C., claiming that C.C. was leaning forward and could have injured the driver. (Doc. 523, at 26-28).

### D. Cartagena is indicted, tried, and convicted.

A federal grand jury charged Cartagena with four counts related to his use of excessive force and his attempts to cover it up:

> **Count 1, Deprivation of Rights under Color of Law, 18 U.S.C. 242**, for using unreasonable force when Cartagena "struck C.C. with his weapon while C.C. was on the ground." This count also alleged that the offense included the use of a dangerous weapon and resulted in bodily injury to C.C.

**Count 2, Deprivation of Rights under Color of Law, 18 U.S.C. 242**, for using unreasonable force when Cartagena "struck C.C. with his hand(s) while C.C. was handcuffed in the back of a police vehicle." This count also alleged that the offense resulted in bodily injury to C.C.

**Count 6, Obstruction of Justice—Falsification of Document, 18 U.S.C. 1519,** for falsifying a use-of-force report about how C.C. was injured.

**Count 7, Obstruction of Justice—Tampering with a Witness, 18 U.S.C. 1512(b)(3),** for misleading a prosecutor about how C.C. was injured.

(App. 33-38).

Although Cartagena signed a plea agreement to resolve all charges (App. 41-52), he later changed his mind about pleading guilty, and the district court allowed him to withdraw his plea. (App. 68-70). The matter then proceeded to a jury trial.

Among the government's witnesses was Dr. Yocasta Brugal, an expert in forensic pathology and forensic medicine. (App. 157, 163). Dr. Brugal testified that based on her medical training and her review of C.C.'s medical records, the injuries on C.C.'s head and back were inconsistent with falling off a bike. (App. 164-165, 184). Dr. Brugal reached this conclusion after meeting with the victim, who told her that (1) he was shot in the back while riding on the front of his bike, and (2) he

was injured in the head by being hit with the butt of a gun.  (App. 175-176).

C.C. did not testify at trial; the government tried but was unable to locate him, possibly because he was homeless.  (Doc. 593, at 42-43). Cartagena requested a missing witness instruction, but the district court denied the request, finding that there was no evidence that the government interfered with Cartagena's ability to find the victim.  (Doc. 593, at 51-52).

After the government rested its case, Cartagena moved for acquittal under Federal Rule of Criminal Procedure 29, but the court denied his motion.  (App. 73).  Cartagena then testified in his own defense, denying that he ever hit C.C. in the head with his gun and denying that he ever punched C.C. in the face, though he acknowledged that his gun and his hands touched C.C.  (Doc. 517, at 16, 18, 33-34, 70).  Cartagena also acknowledged that he had not been truthful both in the use-of-force report and in his subsequent account to the prosecutor.  (Doc. 517, at 28-29, 76, 82-84).  Cartagena explained that he felt compelled to lie because he feared that the other officers might physically harm him if he told the truth.  (Doc. 517, at 28-29, 76, 82-84).

The jury found Cartagena guilty on all four counts. (App. 114-115). Cartagena did not renew his motion for acquittal, and the court sentenced him to 84 months' imprisonment. (App. 214).

## SUMMARY OF THE ARGUMENT

1.   Cartagena's sufficiency-of-the-evidence challenge is doomed from the start.  First, he never moved for acquittal after the close of evidence, thus forfeiting his sufficiency challenge on appeal.  Second, his appellate brief neither addresses this forfeiture nor argues that his conviction would result in a clear and gross injustice, as this Court's precedent requires.  He has thus relinquished his sufficiency challenge twice over.

2.   Should this Court nonetheless review the sufficiency of the evidence, it will find that the jury had abundant evidence to convict Cartagena.  Indeed, Cartagena himself admits that sufficient evidence existed to prove most elements beyond a reasonable doubt.  Cartagena's limited sufficiency challenge focuses on his intent, but the jury had enough evidence to conclude that he willfully used excessive force.  Among other concessions, Cartagena admitted that he knew the law prohibited using excessive force, and he acknowledged that he

intentionally made false statements to cover up what happened.  That is more than sufficient for the Court to affirm his convictions.

3.  Cartagena's Confrontation Clause challenge to the government's expert-witness testimony fares no better.  Although the district court allowed the expert witness to recount a brief statement made by the victim, who was unavailable to testify, the expert's opinions did not hinge on that out-of-court statement.  Instead, the victim's statement was one of many pieces of information that the expert witness considered in reaching her independent medical conclusion.  Moreover, any error in allowing this testimony would be harmless beyond a reasonable doubt given the cumulative other evidence that proved that the victim was pistol-whipped and shot.  Thus, nothing supports vacating Cartagena's convictions.

## ARGUMENT

## I. Cartagena waived his sufficiency challenges by failing to brief whether his convictions resulted in a clear or gross injustice.

This Court need not consider the merits of Cartagena's challenge to the sufficiency of the evidence for two interrelated reasons.  First, Cartagena forfeited his sufficiency challenge by not moving for acquittal

at the close of evidence during trial.  Second, Cartagena's appellate brief does not address this forfeiture issue, thus waiving any challenge to the sufficiency of the evidence on appeal.

Although Cartagena moved for a judgment of acquittal after the close of the government's evidence, he never renewed his motion after he finished presenting evidence.  (App. 73).  As this Court has explained, "[t]he denial of a Rule 29(a) motion, without more, does not preserve an issue for appeal." *United States v. Hernández-Román*, 981 F.3d 138, 143 (1st Cir. 2020).  Rather, "[t]o challenge the sufficiency of evidence after a conviction, the defendant must have preserved his Rule 29 motion by moving for an acquittal *at the close of the defense's evidence* at trial." *United States v. Van Horn*, 277 F.3d 48, 54 (1st Cir. 2002) (emphasis added).  Otherwise, any objection to the sufficiency of the evidence is "deemed forfeited." *Ibid.*

In *Hernández-Román*, the defendant likewise made a Rule 29 motion after the government rested but never renewed that motion after the defense rested or after the jury issued its verdict.  981 F.3d at 143.  Under these circumstances, "an appellate court may not intercede except to prevent a clear or gross injustice." *Ibid*.  And "there can be no clear

and gross injustice if the evidence, scrutinized in the light most congenial with the verdict, can support a finding of guilt beyond a reasonable doubt." *Ibid.*

In his appellate brief, Cartagena does not mention the clear-and-gross injustice standard of review—much less argue that his case satisfies this demanding standard. As this Court recently explained, when an appellate brief "does not mention the clear and gross injustice standard, let alone develop any argument to meet it," a defendant waives his sufficiency arguments. *United States v. Boyrie-Laboy*, 99 F.4th 39, 43 (1st Cir. 2024) (citation omitted). Thus, the Court need not consider any of Cartagena's sufficiency arguments.

## II. No clear or gross injustice would result by affirming Cartagena's convictions.

Should the Court nonetheless consider the sufficiency of the evidence under the clear-or-gross-injustice standard of review, the Court will find that "[t]he evidence in this case easily clears so low a bar." *United States v. Hernández-Román*, 981 F.3d 138, 143 (1st Cir. 2020). After all, "there can be no 'clear and gross injustice' unless there has been such an egregious misapplication of legal principles that reversal is required." *United States v. Boyrie-Laboy*, 99 F.4th 39, 43 (1st Cir. 2024)

(citation and internal quotation marks omitted). Nothing of the sort happened here.

In fact, Cartagena's sufficiency challenge would fail even if he had preserved his objection. That is because when this Court evaluates a sufficiency challenge, it must "scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *United States v. Correia*, 55 F.4th 12, 26 (1st Cir. 2022) (citation omitted). The evidence here comfortably shows that a rational jury could have convicted Cartagena on all counts.

## A.  Abundant evidence supports Cartagena's conviction for willfully using excessive force.

For Cartagena to have been convicted of the excessive-force charges in Counts 1 and 2 of the indictment, the government needed to prove four elements beyond a reasonable doubt:

1)  Cartagena acted under color of law;

2)  Cartagena deprived C.C. of a right secured or protected by the Constitution; here, the right to be free from the use of unreasonable force by a law enforcement officer;

3)  Cartagena acted willfully; and

4) The offense involved the use of a dangerous weapon or resulted in bodily injury.

*See United States v. Pagan-Ferrer*, 736 F.3d 573, 590-591 n.8 (1st Cir. 2013); (Doc. 519, at 15-16 (jury instructions); Br. 27-28 (listing these elements)).

In his brief, Cartagena does not contest that (1) he was acting under color of law, (2) C.C. was subjected to unreasonable police force, and (3) the offense involved the use of a dangerous weapon or resulted in bodily injury. Instead, Cartagena argues that evidence failed to show that *he* willfully assaulted C.C., claiming "[t]he witnesses could not establish with certainty who actually used physical force" against C.C. (Br. 30). Not so. The jury heard extensive evidence showing that (1) Cartagena was the one who assaulted C.C. and (2) Cartagena acted willfully.

**1. The jury had more than enough evidence to conclude that Cartagena assaulted the victim.**

Contrary to Cartagena's argument—which cites no portion of the record (Br. 27-30)—the trial transcripts are chockfull of testimony that a jury reasonably could have credited to conclude that Cartagena pistol-

whipped and punched C.C. without justification while on duty as a police officer:

- One of the other arresting officers testified that she witnessed Cartagena use the butt of his gun to strike C.C. in the head (Doc. 518, at 13);

- An FBI agent testified that Cartagena admitted to forcefully striking C.C. in the head with his gun (Doc. 523, at 12, 36-38);

- The FBI agent also testified that Cartagena acknowledged hitting C.C. in the face during the ride to the precinct, once with a closed hand palm strike and once with an open-palm strike (Doc. 523, at 26-27);

- Another police officer testified that Cartagena told him about hitting C.C. in the face during the car ride (Doc. 534, at 31); and

- Cartagena himself testified at trial that both his gun and his hands touched C.C.'s head (Doc. 517, at 18, 70).

Although Cartagena has argued that some of these witnesses were biased, "[i]n passing upon challenges to the sufficiency of the evidence, we are bound to refrain from making independent judgments as to the credibility of witnesses." *Pagan-Ferrer*, 736 F.3d at 590-591 (alteration in original; citation omitted) (affirming excessive force conviction under 18 U.S.C. 242). Likewise, although Cartagena has argued that the government's witnesses offered conflicting testimony, that too is

insufficient to overturn the jury's verdict. In *Pagan-Ferrer*, for example, this Court found the evidence to have been sufficient despite differing testimony on which officer assaulted the victim. There, as here, "the evidence at trial, viewed in the light most favorable to the government, sufficed to support [the defendant's] conviction" under Section 242. *Id.* at 591.

### 2. The jury had more than enough evidence to conclude that Cartagena acted willfully.

Cartagena also argues that regardless of what force he used, the evidence was insufficient to show that he acted willfully. (Br. 29-30). But again, the jury had ample evidence to reasonably conclude that this element was satisfied.

To act willfully under 18 U.S.C. 242, the defendant must have "a specific intent to deprive a person of a federal right." *Screws v. United States*, 325 U.S. 91, 103 (1945) (interpreting the predecessor statute to Section 242). As the unchallenged jury instructions explained, the government needed to prove that Cartagena acted voluntarily and intelligently (not by accident or mistake) to disobey or disregard the law by using force that he knew was more than a reasonable officer would have used under the circumstances. (Doc. 519, at 20). This standard

requires that he "intended to accomplish that which the constitution forbids," not that he knew which constitutional right he was violating. *United States v. Johnstone*, 107 F.3d 200, 210 (3d Cir. 1997) (approving similar jury instructions in another excessive force case).

The jury had more than enough evidence to reasonably conclude that Cartagena had this intent. To begin, all Puerto Rico police officers receive multiple trainings throughout their employment about the Constitution's prohibition on using excessive force and the potential criminal consequences for officers who violate this prohibition. (Doc. 532, at 21, 24, 30). Specifically, officers are instructed that they may use their guns to shoot or hit a person only when that person is trying to inflict serious bodily harm or death on another. (Doc. 532, at 21, 30-31). And officers are forbidden from using force against a person who poses no threat to himself or others. (Doc. 532, at 26). Cartagena received this training and understood it. (Doc. 517, at 39-42).

Given Cartagena's admission that he knew the legal bounds of permissible force, the jury could reasonably infer that Cartagena acted willfully by pistol-whipping and hitting a restrained youth who was not resisting. *See United States v. Phillipos*, 849 F.3d 464, 476 (1st Cir. 2017)

(upholding jury's finding on willfulness when the evidence showed that a defendant acted after receiving prior notice that the conduct would be illegal). Although that alone would be sufficient evidence, Cartagena also repeatedly lied about and concealed his use of force against C.C., which shows consciousness of guilt. *See United States v. Daniells*, 79 F.4th 57, 73 (1st Cir. 2023) (holding that a jury's finding on willfulness was supported by evidence that the defendant concealed his conduct). Thus, abundant evidence supports the jury's verdict that Cartagena willfully deprived C.C. of his right to be free from excessive police force.

**B.    Abundant evidence supports the jury's conclusion that Cartagena submitted a false police report.**

Likewise, extensive evidence allowed the jury to reasonably conclude that Cartagena was guilty of filing a false police report as charged in Count 6 of the indictment. For this count, the government needed to prove three elements beyond a reasonable doubt:

1)    Cartagena knowingly altered, concealed, covered up, falsified, or made a false entry into a record or document;

2)    Cartagena, acting in relation to or in contemplation of an investigation of a matter, intended to impede, obstruct, or influence an investigation or proper administration of a matter; and

3) The investigation or administration of the matter was within the jurisdiction of the FBI.

*See United States v. Singh*, 979 F.3d 697, 715 (9th Cir. 2020); (Doc. 519, at 24 (jury instructions); and Br. 31 (listing these elements)).

Here, Cartagena does not contest the first and third elements. Indeed, Cartagena admitted at trial that the police report he filed contained false statements (about how C.C. was injured) and omitted required information (about the force used). (Doc. 517, at 27-29, 76, 82-84). Rather, his only argument on appeal is that the evidence did not prove that he intended to obstruct justice when he lied on the police report. (Br. 31). But again, ample evidence allowed the jury to conclude that Cartagena acted with the intent to "impede, obstruct, or influence an investigation or proper administration of a matter." (Doc. 519, at 24).

The most powerful evidence of intent pertained to Cartagena's knowledge that his actions were illegal. First, the jury heard that Cartagena was trained on and understood police policies requiring officers to truthfully document any use of force. (Doc. 517, at 41-42; Doc. 532, at 22). Second, Cartagena admitted on the stand that he knew that filing a false police report could lead to disciplinary action and even

criminal charges. (Doc. 517, at 41-42). These concessions alone were enough for the jury to convict him.

But there was more. The jury also learned that around a month after the shooting, Cartagena confided to another officer that he never reported that Officer Nieves shot C.C. (App. 132-133). The jury also heard that Cartagena expressed concern that his failure to follow proper procedures might impact his future police work. (App. 132-133). This consciousness of guilt further reinforces the jury's verdict.

Cartagena, though, argues that the jury should have credited his account that he lied in the police report because he thought his fellow officers were corrupt and might harm him if he told the truth. (Br. 31). But even if the jury were to have credited this self-serving testimony, it does not help him. Quite the opposite: Cartagena's self-protection argument *concedes* that he intentionally concealed the truth about C.C.'s injuries from investigating officials. Likewise, although Cartagena claims that his cooperation with the FBI shows that he lacked the requisite intent (Br. 31), Cartagena does not mention that he waited nearly a year to call the FBI and even then was not entirely truthful with what he told them. (Doc. 523, at 5; Doc. 524, at 24). The jury thus had

plenty of evidence to reasonably conclude that Cartagena acted with the requisite intent.

## C. Abundant evidence supports Cartagena's conviction for lying to the prosecutor.

Cartagena does not appear to challenge his conviction under Count 7 of the indictment for lying to the prosecutor about C.C.'s injuries, in violation of 18 U.S.C. 1512(b)(3). Cartagena does not cite Section 1512 or mention Count 7 in the argument section of his brief. In fact, his argument section includes just one sentence referencing his lies to the prosecutor: "Moreover and for the sake of the argument, we must remember that the Appellant testified that if he had to lie to the prosecutor [it] was because he was under threat from a gang inside that drug unit of the police." (Br. 31). Then, at the end of his argument, Cartagena states that the government failed to establish that he "had any intent whatsoever to commit the offenses of conviction." (Br. 33).

Even assuming these cursory statements were intended to challenge his conviction under Section 1512 on sufficiency grounds, they fall far short of what this Court requires to pursue an argument on appeal. This Court has emphasized that when a party "neither develops the argument nor accompanies it with even a shred of authority," the

party waives that argument on appeal.  *United States v. Gonzalez*, 981 F.3d 11, 23 (1st Cir. 2020).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  Rather, "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."  *Ibid.* (citation and internal quotation marks omitted).

Because Cartagena only obliquely references his conviction for witness tampering without citing any legal authority, he has waived any challenge to it.  And in any event, no clear or gross injustice exists for his conviction on this count.  For the same reasons discussed above about Cartagena's intentional actions to conceal his crimes from investigators, so too did the jury have sufficient evidence to reasonably conclude that Cartagena acted willfully when he lied to the local prosecutor right after filing that report.  Either way, his conviction should be affirmed.

*** 

In sum, the jury reasonably convicted Cartagena on all counts in the indictment.  The evidence here was overwhelming, especially when viewed "in the light most favorable to the government and indulging all

reasonable inferences in the government's favor," as this Court does with sufficiency challenges. *United States v. Garcia-Carrasquillo*, 483 F.3d 124, 129-130 (1st Cir. 2007). As long as a rational jury "*could* conclude that the prosecution proved all elements of the crime beyond a reasonable doubt," the conviction must be affirmed. *Ibid.* (emphasis added). That is the case here.

### III. The expert's testimony about the victim's statements did not violate the Confrontation Clause.

Cartagena's Confrontation Clause challenge (Br. 33-46), which this Court reviews de novo, *United States v. Andino-Rodríguez*, 79 F.4th 7, 17 (1st Cir. 2023), likewise crumbles under this Court's precedent. "The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine witnesses who testify against them." *United States v. Maldonado-Peña*, 4 F.4th 1, 31 (1st Cir. 2021) (citation omitted). But there is an important caveat to this right: "the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted." *Smith v. Arizona*, 602 U.S. 779, 785 (2024) (citation and internal quotations marks omitted). There was no hearsay here.

According to Cartagena, the government's expert improperly recounted hearsay from the victim, who did not testify at trial. (Br. 33-46). But as explained below, the statements from C.C. were referenced in passing only to show one of many bases for the expert's opinion. This case is thus much different than *Smith*, where the out-of-court statements were imported as the sole basis for the testifying expert's opinion. In any event, given the cumulative other evidence, particularly Cartagena's admissions to the same facts relied upon by the expert, any error in admitting the expert's statements would be harmless beyond a reasonable doubt.

### A. The expert's testimony about the victim's statements was not offered for the truth of the matter asserted.

Dr. Yocasta Brugal is an expert in forensic pathology and forensic medicine who testified about C.C.'s injuries. (App. 163-165). Specifically, Dr. Brugal opined that (1) C.C.'s head injuries were consistent with a blow from a blunt object like the butt of a gun and (2) C.C.'s back injury was consistent with a bullet wound. (App. 163-165, 177-178, 184). Dr. Brugal expressed complete confidence that neither C.C.'s head injury nor his back injury was medically consistent with falling from a bike. (App. 177-178).

Dr. Brugal reached her conclusions based on her extensive experience as a board-certified pathologist and after examining the victim, reviewing pictures of the wounds and medical records, and interviewing the prosecution team and agents. (App. 165, 178). Cartagena offers no challenge to Dr. Brugal's qualifications or methodology. Nor does Cartagena contest that he had a full and fair opportunity to cross-examine Dr. Brugal about why she concluded that C.C.'s head wound was physiologically consistent with blunt force trauma and that C.C.'s back wound was physiologically consistent with a gunshot wound.

Instead, Cartagena contends that Dr. Brugal should have been precluded from answering a threshold question from the prosecutor: "Very briefly, if you could describe some of the information that [C.C.] provided you that was relevant, very briefly, to your assessment as to how he received his injuries." (App. 175-176). As the question demonstrates, the government was not trying to introduce these statements for their truth. Rather, the prosecutor simply asked Dr. Brugal to identify one piece of information, among many, that she considered in reaching her expert opinion. (App. 170-171).

Nor does Dr. Brugal's answer change this understanding: "[C.C.] told me that he received a bullet wound in his back while he was riding a bicycle"; "he received a trauma on his head that he identified had been produced by the butt of a revolver"; and he had been "inclined to the front [of the bike when riding it]." (App. 175-176). As this Court has held, "even where a declarant's out-of-court statement *is* testimonial, the statement may nevertheless be admitted into evidence if . . . the statement is *not* hearsay in that it is being admitted for a purpose other than establishing the truth of the matter asserted." *United States v. Cruz-Diaz*, 550 F.3d 169, 176 (1st Cir. 2008) (footnote omitted). That is what happened here: C.C.'s statements about his injuries were offered only to show that Dr. Brugal considered them when reaching her expert medical conclusions.

To be sure, there are limits on an expert's ability to recount testimonial statements from others. As this Court has long recognized, the Confrontation Clause prohibits expert testimony that simply "parroted the conclusion" of another non-testifying expert. *United States v. Ramos-Gonzalez*, 664 F.3d 1, 6 (1st Cir. 2011). And as the Supreme Court recently clarified, this prohibition on conduit expert testimony

cannot be avoided simply by asking the testifying expert to show the basis for her expert opinion and then having her recount testimonial statements from the non-testifying expert. *See Smith*, 602 U.S. at 793.

In *Smith*, the government's original expert witness prepared a full scientific analysis on drugs seized from the defendant. *Smith*, 602 U.S. at 789-790. But when that expert was not available for trial, the government brought in a new expert to testify about the original expert's findings. *Id.* at 790. The testifying expert witness effectively served as the "mouthpiece" for the unavailable expert, repeating "the precautions ([the unavailable expert] said) she took, the standards ([the unavailable expert] said) she followed, the tests ([the unavailable expert] said) she performed, and the results ([the unavailable expert] said) she obtained." *Id.* at 800. The Supreme Court held that these statements qualified as hearsay, explaining that when "an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795.

No such thing happened here. Dr. Brugal did not serve as a mouthpiece for extensive testimony by an unavailable witness. Instead,

Dr. Brugal only briefly mentioned C.C.'s statement when describing her overall investigation. (App. 175). In fact, as the rest of her 60+ pages of testimony show, Dr. Brugal's independent medical opinion did not depend on the truth of C.C.'s statements. To the contrary, Dr. Brugal relied on pictures of C.C.'s wounds, medical records, and her extensive medical training to conclude that C.C.'s deep and penetrating wounds were medically inconsistent with falling off a bike:

- The pattern of C.C.'s head wound was inconsistent with a fall from a bike (App. 177-178);

- C.C.'s head injury "was a clean wound, meaning that it didn't have anything around it," but if he had fallen off a bike, there would have been "abrasions around the wound, and he didn't have any other injury" (App. 177);

- The injury to C.C.'s back was "a transactional, tangential wound" consistent with a gunshot (App. 165); and

- The deep scarring on C.C.'s back was consistent with a gunshot and inconsistent with falling off a bike (App. 182).

As these examples highlight, Dr. Brugal's conclusions rested on her "independent judgment, gleaned from years of experience," and thus "did not run afoul of the Confrontation Clause." *United States v. Sandoval*, 6 F.4th 63, 87 (1st Cir. 2021). To be sure, Dr. Brugal ultimately reached

a medical conclusion about the cause of C.C.'s injuries that was consistent with C.C.'s self-description of those injuries. But that does not mean that Dr. Brugal's recollection of C.C.'s statement was impermissible hearsay. Rather, as her extensive testimony shows, Dr. Brugal determined the cause of the injuries based on medical evidence, not because she necessarily believed C.C. was telling the truth.

Finally, no support exists for Cartagena's accusation that the government engaged in a "machiavelous scheme" to deprive him of the right to confront C.C. (Br. 45). To the contrary, the district court found "no evidence" that the government interfered with the defense's ability to call C.C. as a witness. (Doc. 593, at 51-52). In fact, the government diligently tried to locate C.C., visiting his mother's home, interviewing family members, assigning FBI analysts to examine databases, and traveling to the Miami airport to try to serve him with a subpoena. (Doc. 593, at 42, 44). Despite these efforts, the government could not find C.C., and defense counsel told the court that C.C. may be homeless. (Doc. 593, at 43). Thus, no evidence of government misconduct exists here.

**B.** **Many other witnesses testified about the source of C.C.'s injuries, making any error in the expert's testimony harmless.**

This Court could also resolve Cartagena's Confrontation Clause challenge by finding that any error would be harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). To determine whether a Confrontation Clause error is harmless, this Court considers whether "statements were merely cumulative, the strength of corroborating or contradicting evidence, and the case's overall strength." *United States v. Godfrey*, 787 F.3d 72, 77 (1st Cir. 2015) (citation and internal quotations marks omitted).

As described above, the challenged statements relayed by Dr. Brugal amount to all of two sentences: (1) "[C.C.] told me that he received a bullet wound in his back while he was riding a bicycle, and that he received a trauma on his head that he identified had been produced by the butt of a revolver"; and (2) "[h]e said he was inclined to the front [of the bike when riding it]." (App. 175-176). That's it. Notably, the statements do not say *who* inflicted these two injuries, only that they occurred. And the evidence that these two injuries occurred is overwhelming.

*First*, many witnesses testified that C.C. was shot:

- Cartagena himself testified that while chasing C.C., he heard the gunshot, followed by C.C. screaming (Doc. 517, at 59);

- Lieutenant Julio Enrique De Jesus-Rivera testified that Cartagena told him that Officer Nieves fired a shot at C.C. (Doc. 534, at 30);

- Officer Shylene Lopez testified that she heard Cartagena tell Officer Nieves, "you're going to take the case because you shot him" (Doc. 518, at 22);

- Officer Wilfredo Rivera-Rivera testified that Cartagena told him about not reporting that Officer Nieves shot C.C. (App. 132); and

- Officer Abner Arroyo testified that Officer Nieves told him that he accidentally shot C.C. (Doc. 535, at 9).

*Second*, several witnesses corroborated that C.C. was hit in the head by the butt of a gun:

- Officer Shylene Lopez testified that she witnessed Cartagena use the butt of his gun to hit C.C. in the back of the head, while C.C. was not resisting (Doc. 518, at 13-14);

- FBI agent Brian Doyle testified that Cartagena admitted using his gun to forcefully strike C.C. in the back of the head (Doc. 523, at 12, 36-38; Doc. 524, at 21-22);

- Cartagena himself testified that his gun touched the back of C.C.'s head (Doc. 517, at 70); and

- Dr. Brugal reviewed medical records from the hospital, which showed a long and deep wound to C.C.'s head (App. 176-177).

In sum, even if Dr. Brugal's descriptions of C.C.'s statements were improper under the Confrontation Clause, that error would be harmless beyond a reasonable doubt because the jury heard abundant evidence corroborating that C.C. had been shot and pistol-whipped. This cumulative evidence reinforces Dr. Brugal's independent medical opinion, which did not depend on C.C.'s statements. This Court should thus reject Cartagena's Confrontation Clause challenge and affirm his convictions.

# CONCLUSION

This Court should affirm Cartagena's convictions.

Respectfully submitted,

W. STEPHEN MULDROW
  United States Attorney

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Deputy Assistant Attorney General

s/ Brant S. Levine
JASON LEE
BRANT S. LEVINE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-4373
  Brant.Levine@usdoj.gov

Date:  June 17, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 7064 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Brant S. Levine
BRANT S. LEVINE
Attorney

Date: June 17, 2025